J-S27015-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| T.J.M. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| N.H.M. | : | No. 57 WDA 2019 |

Appeal from the Order Entered November 27, 2018
In the Court of Common Pleas of Warren County Civil Division at No(s):
A.D. 204 of 2018

BEFORE:   OLSON, J., OTT, J., and COLINS*, J.

MEMORANDUM BY OLSON, J.:                                     **FILED JULY 15, 2019**

Appellant, T.J.M. ("Father"), appeals from the order entered on November 27, 2018.[1]  The order awarded Father and N.H.M. ("Maternal Aunt") shared legal custody of Father's male child with N.D.W. ("Mother"),[2] T.D.M., born in July 2014 ("Child").  The order further awarded Maternal Aunt primary

---

[1] The subject order was dated November 26, 2018.  However, notice pursuant to Pa.R.C.P. 236(b) was not provided until November 27, 2018.  Our appellate rules designate the date of entry of an order as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)."  Pa.R.A.P. 108(b).  Further, our Supreme Court has held that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given." *Frazier v. City of Philadelphia*, 735 A.2d 113, 115 (Pa. 1999).

[2] Mother died in June of 2018 due to liver failure.  N.T., 11/26/18, at 9, 27, and 210.

---

*   Retired Senior Judge assigned to the Superior Court.

physical custody and Father partial physical custody of Child.  After review, we affirm the trial court's order.

Child was born two months premature to Mother and Father in July 2014.  N.T., 11/26/18, at 8.  Following a 28-day stay in the hospital as a result of fetal alcohol syndrome,[3] Child resided with Mother and Father in the home of paternal grandparents, B.L.M. and J.L.M. ("Paternal Grandparents") in Warren County, Pennsylvania.[4]  *Id.* at 10-11, 76, and 214-216.  During the time following Child's birth, Mother and Father drank heavily and often argued.  *Id.* at 108-109, 147-149, and 215-217.  Mother would take Child and leave the home, going back and forth between relatives' homes and Paternal Grandparents' home.  *Id.* at 145-47.  In October 2016, Father was involved in a work-related accident requiring significant rehabilitation due to injury to his legs.[5]  *Id.* at 11-12.  Father was hospitalized for two weeks and thereafter

---

[3] Maternal Aunt reported that Child weighed two pounds and 11 ounces at birth.  N.T., 11/26/18, at 214.

[4] Father continued to reside in Paternal Grandparents' home at the time of the hearing.  *Id.* at 7.

[5] Father described his injuries as follows:

> well, they said dislocated knee.  But, the bone was sticking out the back side of my leg.  And I had nerve damage on both sides and a femur.  I broke my femur right above my knee. Put titanium in above my bone there. . . .  And elbows, and the grill's [sic] stuck through my right hand.

*Id.* at 12.

remained in a nursing home for six months before discharge to Paternal Grandparents' home. *Id.* at 12-13 and 79.

At the time of Father's accident, Mother and Child moved out of Paternal Grandparents' home.[6] *Id.* at 13 and 146-147. Mother fell ill and, after traveling with Child to Hamburg, New York[7] and then to Pittsburgh, Mother was hospitalized in Pittsburgh in January 2018. At the time, Maternal Aunt was working as a traveling surgical technician in Pittsburgh, and Mother and Child began staying with her on January 2, 2018. *Id.* at 34-35 and 210. Mother was hospitalized from January 12, 2018 until February 15, 2018. Mother was then in a nursing home back in Warren, Pennsylvania, near Father, for two-and-a-half weeks, after which time she was released to Father's home with Paternal Grandparents for a week-and-a-half.

On March 24, 2018, after presenting to the hospital in Warren, Mother was transported to the hospital in Erie. After a subsequent stay in a nursing home in Erie, Mother was re-admitted to the hospital in Erie in mid-May and passed away in June 2018. *Id.* at 35-37, 39-41, and 222-234. Throughout this time, Child remained with Maternal Aunt, initially in Pittsburgh, and, since

---

[6] Father testified that, except for a month where Mother kept Child from him, he still saw Child frequently. *Id.* at 32-33.

[7] Child's maternal grandmother resided in Hamburg, New York. Maternal Aunt returned to Hamburg in summers and used this address as her permanent address while working as a traveling surgical technician. *Id.* at 211.

approximately April 21, 2018, at her current address in Hamburg, New York.[8, 9]  Father acknowledged that he originally agreed for Child to stay with Maternal Aunt because he "wanted [Child] close to his mother.  I didn't want to have him that far away from [Mother]."  ***Id.*** at 34.  However, Father indicated that he expressed his ability to care for Child and that he felt Maternal Aunt was going to transfer custody back to him at Easter.  ***Id.*** at 43-45 and 225.

The trial court set forth the following procedural history:

> This matter was initiated by the father filing a *pro se* Complaint for Custody against [Maternal Aunt] on May 10, 2018.  That complaint was referred to the court hearing officer for proceedings in compliance with Pa.R.C.P. 1915.4-2.  Counsel followed up with the filing of a Petition for Special Relief on June 11, 2018.  On June 12, 2018, the court entered an order scheduling an evidentiary hearing on the Petition for Special Relief for June 20, 2018.  Father appeared at the hearing with counsel and advised the court that [Maternal Aunt] had not been served with notice of the hearing.  The court entered an order that date rescheduling the hearing for July 24, 2018.  The order indicated that the court would first hear testimony regarding jurisdiction and venue as [Maternal Aunt] had resided with [Child] for some

---

[8] Maternal Aunt testified that she terminated her work assignment in Pittsburgh and returned to Hamburg "[b]ecause my sister got sick, and I realized that I had to get a stable environment for my nephew."  ***Id.*** at 211.  Before moving into her own home, she, her husband, and Child resided with Maternal Grandmother.  ***Id.*** at 235.

[9] Father visited Mother frequently and saw Child, particularly while Mother was in Pittsburgh.  In fact, on at least one occasion, Maternal Aunt paid for a motel room for Father in Pittsburgh.  ***Id.*** at 36, 225-26, 233.  In addition, Father kept in touch with Maternal Aunt through text and Facebook Messenger.  ***Id.*** at 43, 224, 227-29.

> period of time in both Allegheny County and New York State.[10]
>
> The court conducted an evidentiary hearing on July 24, 2018. Again[, Maternal Aunt] did not appear, however, proper service of notice of the hearing had been made.[11]  At the conclusion of the hearing[,] the court entered an order finding that Pennsylvania had initial child custody jurisdiction over the matter, that Warren County had proper venue, [and] that [Maternal Aunt] stood *in loco parentis* to [Child.  The order] award[ed] shared legal custody of [Child] to [Father] and [Maternal Aunt], award[ed] primary physical custody to [Maternal Aunt], and award[ed] alternating weekend periods of physical custody and an uninterrupted one [] week period of physical custody to [Father,] pending further order of court.

Trial Court Opinion, 12/31/18, at 2-3 (footnote and some capitalization omitted).

The court conducted a hearing on the underlying Complaint for Custody on November 26, 2018.  Father and Maternal Aunt, represented by counsel, each were present and testified on their own behalf.  In addition, Father presented the testimony of Paternal Grandparents and his friend, O.V. Maternal Aunt presented the testimony of her husband, R.M.[12]

---

[10] We note that Maternal Aunt filed a custody matter in New York, which was ultimately dismissed.  **Id.** at 50-53.

[11] At the subsequent hearing, Maternal Aunt testified that she was confused as to the court dates and that she would never purposefully avoid a court hearing.  **Id.** at 236-38.

[12] The court did not speak with Child given Child's young age.  N.T., 11/26/18, at 5.  On this topic, the court stated, "Counsel, [C]hild is too young for me to interview.  He is four and a half, a little bit less, so I am not going to be

By order entered November 27, 2018,[13] the trial court awarded the parties shared legal custody of Child. Order, 11/27/18, at ¶ I.A. The court further awarded Maternal Aunt primary physical custody during the school year, or the months of September through May prior to school enrollment, and Father partial physical custody every other weekend from Friday at 5:00 p.m. until Sunday at 5:00 p.m. *Id.* at ¶ I.B.1. During the summer, or the months of June through August prior to school enrollment, starting the first Sunday in June,[14] or the first Sunday after Child's last day of school, Father was to have physical custody every third week, from Sunday at 5:00 p.m. to Sunday at 5:00 p.m. *Id.* at ¶ I.B.2. The court additionally provided for, among other things: a vacation and holiday schedule; shared transportation; prohibition of drugs and alcohol during custodial time; and, encouragement of telephonic communication between Child and the non-custodial party. *Id.* at ¶¶ I.B.3, II., III.B., III.F. Further, the court addressed the burden of proof required, given that Maternal Aunt is a third party, and each of the custody factors pursuant to Section 5328(a) on the record at the close of the hearing. N.T., 11/26/18, at 305-335. As to burden of proof, the court stated,

---

interviewing him. If he is waiting outside the courtroom, somebody can take him someplace more comfortable." *Id.*

[13] This order memorialized the decision placed on the record by the court at the conclusion of the hearing. *Id.* at 336.

[14] While the order states September, it appears there was a typographical error in the order and that this should be June.

I am required to place all of my findings on the record with respect to factors set forth under 23 Pa.C.S.A. section 5328.

Also, . . . I am guided by the presumption under section 5327 subsection B in any action regarding the custody of a child between a parent and a nonparent, there is a presumption that custody shall be awarded to the parent.

That presumption may be rebutted by clear and convincing evidence. And, the cases make it clear that that's evidence that is so clear, direct[,] weighty and convincing to [enable] the trier of fact to come to a clear conviction without hesitation of the truth of the precise facts in issue. In this case[,] it's really with respect to the best interests.

But, in all of my findings and my order, I am utilizing all of the factors under 5328 and also the presumption under 5327 and, necessar[ily], I will indicate my findings.

And really what that statute does, it's a little bit of a burden shifting in a custody hearing between parents. There is no presumption. Scales are even.

And, a preponderance of the evidence of best interests. So, the scales are tip[ped] a little bit when it's a parent and a third party statutorily, and long-standing case law. So[,] I [] will apply that.

*Id.* at 304-305. The court then analyzed each of the Section 5328(a)

factors.[15] *Id.* at 305-335. The court discussed, in part,

The first factor is which party is more likely to encourage and permit frequent and continuing contact between the child and the other party.

I guess we start with a bit of an impasse in that [Maternal Aunt] was talking about [adopting Child] early on, which

---

[15] The trial court did not separately address Section 5328(a)(2.1). While Father testified that CYS had some sort of involvement following Child's birth, he testified that there were no interviews. *Id.* at 26-27. Moreover, there is no evidence of any continuing investigation or finding or provision of services. We, therefore, do not find this factor relevant.

would basically terminate [Father's] rights. And, [Father], on the other hand, in a recent conference, basically said[] he wants [Maternal Aunt] out of [Child's] life.

Not a good starting point on trying to determine who would encourage and permit frequent and continuing contact.

I do note that once my order went into effect, both parties complied with it. I also note that [Maternal Aunt] permitted time that wasn't set forth in the order.

I didn't say that it was a minimum schedule. I was concerned about the absence of [Father] for a period of time. And, I set forth a schedule of alternating weekend, and the seven[-]day period. So, had a little framework for the custody hearing, I felt that was appropriate.

[Maternal Aunt] permitted the Halloween that wasn't on [Father's] schedule. She provided some extra transportation. So, I don't think this is a factor that plays a large part in my decision.

A little bit concerning, both sides dug their heels in to a certain extent, maybe, staked their grounds where [Child] is concerned. But, nothing that would indicate that the parties aren't going to comply with my court order.

The next factor is the present and past abuse committed by either party or members of the [party's] household. And whether there is a continued risk of harm to [Child] as a result of that. And if so, which party can provide adequate physical safeguard and supervision of the child.

I heard nothing with respect to [Maternal Aunt] or her husband with respect to any type of abuse, domestic violence between the two of them.

Nothing with respect to any concerns about [Child's] care in their custody. So, there is no present or past abuse history with respect to [Maternal Aunt].

On [Father's] side[,] and I do note, all of these incidents pre-date [Father's] accident. Very unfortunate. And pre-date, I guess you would say, the light going on for him that he had no future with drinking.

Tested him. He had no alcohol, anything else in his system. Heard no evidence that he has been violent or aggressive since he has been on the wagon or almost on the wagon. Other than the one custody transfer. And what went on at that one. Wasn't great. But it certainly didn't amount to abuse.

The past history with [Father] and [Mother] [is] extremely troubling. And, to be honest, [there] should have been intervention, the, if not the agency, somebody should have protected [Child].

He was in a drunken no-man's land drinking from sun up to sundown, fighting, scream[ing], yelling, screaming in the middle of the night. Pushing, shoving. Taking him to drinking events, apparently.

And, essentially, what it was in my determination, [Father] and [Mother] would get completely drunk, get ticked off at each other, and go at it verbally and sometimes physically.

It's not a justification for abuse. [Maternal Aunt] testified about one incident that she observed firsthand. I found her credible. I found [Father] credible. So, some type of domestic violence whether it's verbal, physical threats, whatever it was, did occur.

But, under the current circumstances and the testimony that which is, essentially, uncontradicted, that [Father] does not do the same type of drinking that he did when he and [Mother] were an on again and off again couple.

And absolutely no indication that he has been mean or physical with [Child] or with other members of his household. I don't see it as a current concern that [Father] is going to become physically violent, particularly with [Child] in his home.

The next factor are the physical duties performed by each of the parties on behalf of [Child]. [Maternal Aunt] has had him since January of 2018. And he has been in her care since that time.

So, we are talking about ten or [11] months, [ten-and-a-half] months of primary physical custody with [Maternal Aunt], and particularly so, since she hasn't taken any new work

contracts and has been a stay at home mom, I might be off a month or two but I think in the spring of this year, maybe starting in April a little bit earlier.

And, certainly she has been performing the lion's share of all of [Child's] [caregiving] over that [ten-and-a-half] month period.

Her husband, [R.H.], who is employed presently, has certainly assisted in the [caregiving], particularly in Pittsburgh during the time [Mother] was there and [Maternal Aunt] was working. And, obviously, her husband was caring for [Child].

So, over the last [ten-and-a-half] months, nobody could argue that [Maternal Aunt] has been [Child's] primary bordering on exclusive caregiver. She has been responsible, really, for ever[y] aspect of his life for that period of time.

Before that she wasn't [Child's] caregiver, but she was frequently interacting with her sister and [Child]. And begun to develop a relationship. But[,] as far as [caregiving], that's my finding with respect to [Maternal Aunt].

On [Father]'s behalf, a little bit more difficult to pin it down other than the couple went to his parents' home after [Child] got out of the NICU, and they drank and yelled their way through.

There was, I guess, some period of time where it wasn't as bad. But, [Father] would go to work. The mother would stay at home and drink. Sometimes the grandmother would help out.

And when the dad got home from work, he would help out. During that period of time, [Mother] left frequently to [J.H.]'s house.[16]  Always took [Child] with her. For good or bad.

And, she would provide the care that she could under his roof. And there would be a reconciliation, and it would go back and forth.

---

[16] [J.H.] is Mother's stepfather and Maternal Aunt's father. *Id.* at 209.

I guess the best way to conclude, I wouldn't consider anybody appropriately performing parental duties for [Child], at least for that couple years after he was home.

You can't say you are intoxicated and providing appropriate care, coming and going, it was a sketchy period of time for sure.

Starting in January of this year, and for whatever reason, [Child] doesn't know the reasons behind the scenes, what the adult decisions are, what the motivations are, he just knows who tucks him in bed.

For whatever reason, starting in January, [Father] more or less permitted [Maternal Aunt] to take over [caregiving]. Initially, I guess, because she was in Pittsburgh close to the mother's hospital. And that way [Child] could see his mom and be under his aunt's care.

I am not so sure that that's a parent carrying out their duties. I don't, I didn't hear that [Father] was employed or otherwise occupied.

Another option would be let [sic] get [Child] back in his family home, I will take care of him day-to-day. You got to work [] all day as [a] surgical tech.

I will, me and[] [O.V.] will go down to Pittsburgh as frequently as we can, when [Mother] is in good shape[,] to [take Child] to visit his mom.

I think that is an alternative that puts him back in the shoes of [Father]. And, it is kind of compounded with all of the other times that [Mother] left and he, basically, waited for her to come back.

He would visit [Child] at [J.H.]'s house. But, nonetheless, up until my court order in July, on July 24th, [Father] wasn't performing any parental duties.

Since then, he has been exercising his court[-]ordered period of physical custody when he has [Child]. It sounds like he is with him. Isn't delegating his [caregiving].

Feeds him, bathes him. Gets him dressed. Provides for his other care, took him to the walk-in clinic a couple times when he observe[d] concerns. And, otherwise, cared for him.

So, that's my findings from birth until now, the parties['] parental duties performed on behalf of [Child].

The next factor is the need for stability and the continuity in [Child's] education, family life and community life. And, I don't think I have ever seen a four-year[-]old in more need of that type of stability and continuity.

Frankly, with the first, I guess, three plus years of his life, for what he went through, it's stunning to me that the parties aren't dealing with rather intense emotional issues, mental health issues, behavioral issues, because [Child] had a pretty nasty early life.

You know, after being born with fetal alcohol syndrome, he goes to [Father's] parents to live there. Then there is fighting. And, he goes with the mom to someplace. . . .

[Mother] would go to [J.H.]'s place. Lived in a hotel in Pittsburgh. Absolutely nothing that he could hang his hat on that this is my home. This where I am supposed to be.

This is when I do this. This is when I eat. This is when I go to bed. It's back and forth and in the wind, depending on how drunk [Mother] got. How big of a fight was. How long she was going to stay at [J.H.]'s, and if and when she was going to come back.

And, coupled with that, was the illness and unfortunate passing of his mother. He had to deal with that at a young age. And, all the disruptions that went along with that. No doubt he was in good care, but living in a hotel suite, a tough run for a three[-] or [four-year-old].

He needs a period of stability, security, where he knows where home is. He knows who his primary [caregivers] are. He knows when he goes to bed. When he gets up. He needs to be in preschool. He needs to have his dental care addressed.

He needs to be a four-year[-]old instead of what he has been put through. It's my sincere hope that issues don't develop in the future because what he has went through.

And, I think the family is to be commended for stepping in when [Mother] was ill. And since then. But he needs

absolute[] stability and continuity in every aspect of his life for some period of time.

. . .

The next factor are the, is, rather, [Child's] sibling relationships. He has two half[-]brothers, [C.] and [B.] Both eleven years old.

[Father] is the father of those two. They have different mothers. They are in the home presently, just about every weekend. Times when there isn't school. They are 11. [Child] is [four].

I understand that difference and I understand the boys might have some special needs, and some issues that are being work[ed] on.

That being said, I think both sides indicated that [Child] likes his brothers. Loves them, I would assume. Enjoys being with them.

I didn't really hear anything of specific concern about the two of them, the mooning thing is nonsense. Obviously, that's not a great thing.

It's not [a] good thing to teach a four-year[-]old to pull his pants down and flash his buttocks. I have seen worse. And, it sound[s] like [Father] is on top of that.

And, [Child] should and will be able to develop a relationship with the boys. If there is ever a concern in the future about that, somebody can get to me or another court and it can be addressed.

But, it sound[s] like they play. They interact. And they are brothers. So, [] that can be a good thing, and it should be. There [are] no siblings on the mother's or the aunt's side to speak of. Cousins, no siblings.

. . .

The next factor is which party is more likely to maintain a loving, stable, consistent nurturing relationship with [Child] adequate for his emotional needs and which party is more

likely to attend to the daily physical, emotional, developmental, educational and special needs of [Child].

And both of those factors favor the aunt. She has done that for the last ten months. They have been in the same home for I guess the last six or seven months.

Achieved the first stability [Child] has ever had in his life. Providing care for him. And there is no record of [Father] doing the same when he was parenting or co-parenting [Child], along with [Mother].

It was a bad situation. I think the paternal grandmother was honest about that. They would fight. She would tell [Mother] to leave because of her drinking.

They would come back. She would start drinking. They would fight, she would tell them to leave. And, [Mother] was the primary caregiver between the two of them.

And, for the most part, she was an intoxicated primary caregiver, and [Father] had every legal right and ability to step in at any point to address that.

But, I think he was mired in his own alcohol issues. I am not saying that [Child] was neglected, mistreated or abused while he lived with [Father] and [Mother] coming and going between [J.H.'s] house, and [Paternal Grandparents'] house.

But, nobody could argue that that was maintaining a stable, consistent nurturing relationship or dealing with [Child's] day-to-day needs.

Not when the two parents in charge of his well[-]being delegate [caregiving] on a day-to-day basis from an all for and [sic] all day drinker and all of the police calls, the problems that occurred.

And I understand from [Father's] standpoint, he could point the finger at [Mother] and say, hey I am just reacting to her drunken tirades; but, it was more than that.

He was doing his own drinking. He didn't take steps to protect [Child] from that environment. So, there is [] no real history upon which I could determine that [Father] could provide the same type of stability that [Maternal Aunt] has at her home in Hamburg.

It['s] just, a complete void of past evidence that would support that proposition; whereas, I know for the ten months leading up to the custody hearing, [Maternal Aunt] has done that for him at her home with the help of her husband[,] and[,] part of prior to [] that time[,] her mother and stepfather.

This is a finding certainly by clear and convincing evidence. I couldn't point to one bit of testimony where I could say here is a period of time where [Father] on his own without his mother breathing down his neck, without [Child's] mother disrupting everybody's life that he stepped up and said, I am going to address this. I am going to care for this. He needs the stability and structure.

You move out to [J.H.]'s, you are not going. And, perhaps the wake up call regarding his alcohol abuse should have come voluntarily early on when he saw how things were going. Not good at all.

So, that is a finding certainly by clear and convincing evidence. And, that would favor [Maternal Aunt's] side of the case.

. . .

So, the other relevant factors [are] that we sit here today, after ten months and in his aunt's care, this is the condition that [Child] is in. And he is in good condition.

So, I can't disregard that and say, well I can't he is in great shape developmentally, but let's try something different, because somebody is a biological parent. And somebody else isn't. His development, how well he is doing currently, the fact that that's after ten months in the exclusive custody of [Maternal Aunt], tells me by clear and convincing evidence that he needs to stay there on a primary basis. You could walk away with really no other conclusion.

And again, I am applying the burden of proof. I find that [Maternal Aunt] has overcome the presumption that [Child] should be placed with his father by the clear and convincing evidence I just outlined.

One final note is I understand [Father] had a rough go of it with his accident. That his rehab took a while. He is really just getting his feet under him.

But, there was a period and I would say the end of 2017, until he filed his custody petition that he didn't assert himself as a father.

He didn't take the bull by the horns and say, I am taking my kid home. I will bring him to see his mom. Or, get into court in January, February, and say, you know, this is my son.

He, I just found that it seems like he is not extremely assertive. And, maybe in an effort to keep the peace, didn't assert himself.

But, parents do have to assert themselves. You have to irritate teachers, doctors, friends, parents. You can't sit back for the ride. You have to drive the vehicle. You have got to take control.

You have got to get to the schools. Get to medical appointment[s]. And for that period of time, I don't think [Father] did what he could have to assert his parental rights to [Child].

N.T., 11/26/18, at 305-318, 321-324, and 333-335.

On December 27, 2018, Father, through counsel, filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i) and (b). Thereafter, the trial court issued an opinion, pursuant to Pennsylvania Rule of Appellate Procedure 1925(a).

On appeal, Father raises the following issues for our review:

1. Did the trial court err and commit an abuse of discretion in awarding primary physical custody of the child to the aunt, and in finding the aunt had rebutted the presumption to award primary custody to the parent under 23 Pa.C.S.A. § 5327 upon a showing of clear and convincing evidence?

2. Were the trial court's findings pursuant to the child custody factors set forth in 23 Pa.C.S.A. § 5328 unsupported by the certified record?

3. Did the trial court err and commit an abuse of discretion by failing to analyze the present ability of the Father to care for the child separately and independently from the prior conduct of the child's recently deceased Mother?

4. Did the trial court err and commit an abuse of discretion by the demonstration of bias against [Father] throughout this proceeding?

Father's Brief at 14.[17]

In custody cases under the Child Custody Act, ("the Act"), 23 Pa.C.S.A. §§ 5321-5340, our standard of review is as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*C.R.F. v. S.E.F.*, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

This Court consistently has held:

[t]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special

_____

[17] We observe that Maternal Aunt did not file a brief in support of her position with this Court.

nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006) (*quoting **Jackson***

***v. Beck***, 858 A.2d 1250, 1254 (Pa. Super. 2004)). In addition,

[a]lthough we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

***M.A.T. v. G.S.T.***, 989 A.2d 11, 18-19 (Pa. Super. 2010) (*en banc*) (citations

omitted).

The paramount concern in any custody case decided under the Act is the best interests of the child. ***See*** 23 Pa.C.S.A. §§ 5328 and 5338. Section 5323 of the Act provides for the following types of awards:

**(a) Types of award.—**After considering the factors set forth in section 5328 (relating to factors to consider when awarding custody), the court may award any of the following types of custody if it is in the best interest of the child:

(1) Shared physical custody.

(2) Primary physical custody.

(3) Partial physical custody.

(4) Sole physical custody.

(5) Supervised physical custody.

- 18 -

(6) Shared legal custody.

(7) Sole legal custody.

23 Pa.C.S.A. § 5323(a).

As between a parent and a third party, Section 5327 states, in part: "In any action regarding the custody of the child between a parent of the child and a nonparent, there shall be a presumption that custody shall be awarded to the parent. The presumption in favor of the parent may be rebutted by clear and convincing evidence." 23 Pa.C.S.A. § 5327(b). It therefore follows,

> where the custody dispute is between a biological parent and a third party, the burden of proof is not evenly balanced. In such instances, the parents have a *prima facie* right to custody, which will be forfeited only if convincing reasons appear that the child's best interest will be served by an award to the third party. Thus, even before the proceedings start, the evidentiary scale is tipped, and tipped hard, to the biological parents' side.

*V.B. v. J.E.B.*, 55 A.3d 1193, 1199 (Pa. Super. 2012) (*quoting* *Charles v. Stehlik*, 744 A.2d 1255, 1258 (Pa. 2000)).

We further explained,

> What the judge must do, therefore, is first, hear all evidence relevant to the child's best interest, and then, decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side. [*McDonel v. Sohn*, 762 A.2d 1101, 1107 (Pa. Super. 2000) (quoting *Ellerbe v. Hooks*, 416 A.2d 512, 513–514 (Pa. 1980))]. In [*Ellerbe*,] our Supreme Court noted that "these principles do not preclude an award of custody to the non-parent. Rather they simply instruct the hearing judge that the non-parent bears the burden of production and the burden of persuasion and that the non-parent's burden is heavy." Essentially, the Supreme Court determined, "where circumstances do not clearly indicate the appropriateness of awarding custody to a non-parent, we believe the less

intrusive and hence the proper course is to award custody to the parent or parents." [***Ellerbe***, 416 A.2d] at 514.

***V.B.***, 55 A.3d at 1199.

Section 5328(a) sets forth the best interest factors that the trial court must consider in awarding custody. ***See E.D. v. M.P.***, 33 A.3d 73, 79-80 n.2 (Pa. Super. 2011). Specifically, Section 5328(a) of the Act provides as follows:

**§ 5328. Factors to consider when awarding custody**

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

Further, with regard to the Custody Act, we have stated as follows:

**All** of the factors listed in Section 5328(a) are required to be considered by the trial court when entering a custody order. . . . The record must be clear on appeal that the trial court considered all the factors.

Section 5323(d) provides that a trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S.A. § 5323(d). Additionally, Section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen Section 5328(a) custody factors prior to the deadline by which a litigant must file a notice of appeal.

In expressing the reasons for its decision, there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations. A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d).

*A.V. v. S.T.*, 87 A.3d 818, 822-23 (Pa. Super. 2014) (corrections and some quotations and citations omitted) (emphasis in original).

We address Father's first two issues together, as the issues are interrelated and Father combines them in his brief. Father argues that the court erred in finding Maternal Aunt, as a third party, had met her burden for an award of primary physical custody. Father's Brief at 23.

Father asserts that the court misstated the burden Maternal Aunt had to meet. *Id.* at 22-23. He states,

The court's characterization of the scales being tipped "a little bit" runs seriously contrary to the requirements of case law cited above, and by the citations provided by the trial court itself. This statement indicates how the trial court possibly determined [Maternal Aunt] met her burden of proof; because the court did not perceive the burden to be as great as in fact it should have been.

*Id.* at 23 (some capitalization omitted).

Father further challenges the trial court's determinations as to the Section 5328(a) factors. *Id.* at 23-29. Father recognizes that the trial court

found factors 2, 3, 9, 10, and arguably 4, in favor of Maternal Aunt. He maintains that "[t]he findings themselves were not weighty enough to meet the enhanced burden of proof, or should not have been assigned to [Maternal Aunt] or determined neutral." *Id.* at 23. Father also argues that the court should have found factor 6 in favor of Father. Father states,

> In conclusion, after review of the factors discussed by the trial court, an error of law was committed in finding that the burden of proof of clear and convincing evidence was met, when only at most five of the factors were assigned to [Maternal Aunt]; and when the court made findings that clearly mitigated the award of those factors to preclude [Maternal] Aunt's satisfaction of the burden of proof.

*Id.* at 29 (some capitalization omitted).

In addition, Father contends that the trial court erred in failing to find factors 1 and 16 against Maternal Aunt. *Id.* at 30-37. Father points to Maternal Aunt's pre-hearing behavior, such as her stated desire to adopt Child, and her failure to initially provide Father with her new address in Hamburg. *Id.* at 30-34. He further highlights her failure to appear for court. *Id.* at 34-37. Father's claims fail.

As to Father's claim of error with regard to the burden of proof, the trial court reasoned:

> The court directly and repeatedly addressed this issue at the conclusion of the hearing in its opinion on the record. The court recited the statutory presumption and indicated that was the framework for the court's findings. The court clearly indicated that [Maternal Aunt] bore the burden of overcoming the presumption in favor of the father and the court further defined the "clear and convincing evidence" standard as the Superior Court has as evidence "that is so clear, direct, weighty, and convincing so as to enable the trier of fact to

come to a clear conviction, without hesitation, of truth of the precise facts in issue." ***V.B. v. J.E.B.***, 55 A.3d 1193, 1199 (Pa. Super. 2012). That is the standard and framework upon which the court decided this matter. It is not a case where the court placed the parties on equal footing for purposes of analyzing the evidence. [***See***] ***M.J.S. v. B.B. v. B.B.***, 172 A.3d 651 [] (Pa. Super. 2017). The court could not have made it clearer on the record. The parties were not on an even playing field. [Maternal Aunt] had to overcome the presumption that [Father] should be granted custody of [Child] by clear and convincing evidence. Based upon the court's analysis of the custody factors, and taking into consideration the presumption and burden of proof, the court determined that [Maternal Aunt] had met that burden of proof and rebutted the presumption.

Trial Court Opinion, 12/31/18, at 3-4.

With this, we agree and find no abuse of discretion.

With regard to the custody factors, we have stated that the trial court is required to consider all of the Section 5328(a) factors in entering a custody order. ***J.R.M. v. J.E.A.,*** 33 A.3d 647, 652 (Pa. Super. 2011). Although the court is required to give "weighted consideration to those factors which affect the safety of the child" pursuant to 23 Pa.C.S.A. § 5328(a), we have acknowledged that the amount of weight a court gives any one factor is almost entirely discretionary. ***M.J.M. v. M.L.G.***, 63 A.3d 331, 339 (Pa. Super. 2013). Critically, as we stated in ***M.J.M.***:

> **It is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case**. *See A.D. v. M.A.B.,* 989 A.2d 32, 35-36 (Pa.Super. 2010) ("In reviewing a custody order . . . our role does not include making independent factual determinations. . . . In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand."). Our decision here does not change that.

*Id.* (emphasis added). Further, we have noted that, while the primary caretaker doctrine is no longer viable, a court may still consider a parent's role as primary caretaker in its consideration of the custody factors.

> We hasten to add that this conclusion does not mean that a trial court cannot consider a parent's role as the primary caretaker when engaging in the statutorily-guided inquiry. As discussed above, a trial court will necessarily consider a parent's status as a primary caretaker implicitly as it considers the [S]ection 5328(a) factors, and to the extent the trial court finds it necessary to explicitly consider one parent's role as the primary caretaker, it is free to do so under subsection (a)(16).

*Id.*

Father's claim on appeal is a challenge to the trial court's findings of fact and determinations regarding the credibility of witnesses and the weight that it attributed to certain Section 5328(a) factors. Father, in essence, questions the trial court's conclusions and assessments and asks this Court to re-find facts, re-weigh evidence, and/or re-assess credibility to his view of the evidence. This we cannot do. Under the aforementioned standard of review applicable in custody matters, the trial court's findings of fact and determinations regarding credibility and weight of the evidence are not disturbed absent an abuse of discretion. *See C.R.F.*, 45 A.3d at 443; *see also E.R.*, 129 A.3d at 527. As we stated in *King v. King*: "[i]t is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, [giving] due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion." *King v. King*,

889 A.2d 630, 632 (Pa. Super. 2005)(*quoting* **Hanson v. Hanson**, 878 A.2d 127, 129 (Pa. Super. 2005). After a thorough review of the record, we find no abuse of discretion. Further, to the extent Father additionally challenges the weight attributed to any factor by the trial court, we likewise find no abuse of discretion. As stated above, the amount of weight that a trial court gives to any one factor is almost entirely within its discretion. **See M.J.M.**, 63 A.3d at 339. Hence, the trial court was within its discretion to emphasize parental duties and Child's stability and well-being.

In the case *sub judice*, the trial court reasonably analyzed and addressed each factor under Section 5328(a). **See** N.T., 11/26/18, at 305-335. After a careful review of the record, we determine that the trial court's findings and determinations regarding the custody factors set forth in Section 5328(a) are supported by competent evidence in the record, and we will not disturb them. **See C.R.F.**, 45 A.3d at 443; **see also E.R.**, 129 A.3d at 527. As such, Father's claim of error is without merit.

Next, Father claims trial court error for failure to analyze his present ability to care for Child separate and apart from the conduct of Mother. Father's Brief at 37. As to this issue, Father argues as follows:

> The trial court never made a finding, nor did the record support a finding, that the Father's residence was objectionable after Mother's passing. The record establishes that the house, as currently occupied by Father, paternal grandparents, and from time to time the child's brothers, was suitable for children. Accusations about arguments between [Father] and his father were denied. The children were safe in their activities. The children had plenty of appropriate activities. The [c]ourt treated any concerns about his

brothers' misbehavior with little weight. The [c]ourt did not make any finding, against the Father or otherwise, regarding the paternal grandfather's alcohol use. The record only supports the conclusion that Father could presently provide an acceptable household which met the statutory factors.

The record established a clear distinction between the atmosphere of [Father's] household when Mother was alive as full of conflict and tumult, and after Mother's passing, which provided a sense of normalcy. During the same period of time from the Mother's passing to the time of the custody trial that the trial court attributed to [Maternal] Aunt a level of stability that the child had not experienced while in Mother's primary care, the Father demonstrated during his time with the child the he was providing stability as well.

. . .

[T]he trial court in this matter has placed too great a focus on Father's previous misconduct, of which significant findings were made that it is no longer taking place. To abide by the trial court's focus on Father's past conduct, and not on the present ability of Father, there is no substantial identifiable condition which Father is to improve upon which would tip the scales back in Father's direction. If Father continues with the adequate care that he is providing to the child while in his custody every other weekend, and the [a]unt continues to provide unobjectionable care, by the [c]ourt's logic, focusing on the past conduct of Father, custody will always remain with the [a]unt. It was therefore an error of law for the trial court to have found the clear and convincing burden of proof was met[,] primarily by evidence of either Mother or Father's past conduct, when the trial court did not find the child suffered from harm therefrom.

*Id.* at 38-39 and 41-42.

On this topic, the trial court stated,

The court fully considered all testimony and evidence and most certainly analyzed [Father's] current circumstances in its findings. For example, the court did address [Father's] past alcohol abuse and incidents of domestic disputes with the late mother of [Child] as the court is required to consider the "history of drug or alcohol use of a party" (23 Pa.C.S.A.

- 27 -

§ 5328(a)(14), and "present and past abuse committed by a party" (23 Pa.C.S.A. § 5328(a)(2)). It should be further noted that [Child] was a four[-]year[-]old child and all of the findings occurred in that relatively brief time span. The court, however, also made explicit findings regarding [Father's] current circumstances. The court found that [Father's] past alcohol abuse had been addressed by [Father] and he drank only infrequently. As a result, the court stated on the record that this was not a factor that would be weighed against [Father]. The court also found that the repeated instances of the domestic turbulence between [Father] and the mother were no longer present as the mother had passed away. The court indicated that there were no concerns regarding [Father] presently and no risk to [Child] in his father's care. The court noted that the regular periods of physical custody [Father] had with [Child] following the order of July 24, 2018, had gone well and that no witnesses expressed any concern about [Father's] care of [Child], the paternal grandmother assisting in that care, or the physical accommodations for [Child] in their home.

In making its findings regarding the parental duties performed by each party on behalf of the child, the court must look at the history of caregiving for the child during his lifetime. (23 Pa.C.S.A. § 5328(a)(3)). In the present case[,] all witnesses, including [Father] and paternal grandmother, painted a picture of a turbulent, unstable and alcohol dominated existence for [Child] in the three [] years that he lived with [Father] and [Mother] after his extended stay in the NICU for fetal alcohol syndrome. In the paternal grandmother's home, [Child] was in the care for the most part of a regularly intoxicated mother. [Father] was drinking heavily at that time. There were repeated separations where [Mother] would take [Child] and live with a relative. The court relied upon that testimony in concluding that [Father] had never been a consistent, sober and stable provider of parental duties for [Child]. This was contrasted by [Maternal Aunt's] consistent performance of parental duties in the ten [] months preceding the custody hearing.

The court is also required to make predictive findings as to "which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs" (23 Pa.C.S.A. §5328(a)(9)),

and "which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child." (23 Pa.C.S.A. §5328(a)(10)). The court has to analyze what has transpired in the past, as well as the current circumstances, in making this analysis and that is what the court did. In particular, the court fairly concluded that the past ten [] months prior to the hearing, and in particular the last six [] months after [Child] moved to New York [S]tate with [Maternal Aunt], was the most [stabile], consistent nurturing period of his life and the period in which his daily physical, emotional and developmental needs were attended to. With the backdrop of [Father's] past periods of custody and his current circumstances, contrasted with the most recent ten [] months of [Child]'s life, the court determined that this was clear and convincing evidence that [Maternal Aunt] was more likely to maintain a loving and consistent relationship and attend to [Child]'s needs. This finding was supported by the findings at [Child]'s . . . pediatric visit which took place just a few weeks before the hearing. The pediatrician found that [Child] was healthy, active, well-adjusted and developmentally on track in all areas. Considered in the context of the court's finding that [Child], following an inconsistent early childhood, with many moves and inconsistent care, was in great need of stability and continuity in his life, this further supported remaining with his current caregiver.

Finally, the court's provision for regular periods of physical custody for [Father], including at a minimum, every other weekend, approximately four [] or [five] full weeks during the summer, as well as shared holidays, was based upon the court's full consideration of [Father's] present circumstances and ability to care for [Child]. These regular periods of physical custody were designed to re-adjust [Child] to [Father]. [Child] had gone months without seeing his father prior to the special relief order, for whatever reason, and had been cared for exclusively by [Maternal Aunt]. To completely disrupt that stability and consistency in [Child]'s life was determined, by clear and convincing evidence, not to be in [Child]'s best interests.

Trial Court Opinion, 12/31/18, at 4-6.

Upon review, Father's claim is without merit. We agree with the trial court for the reasons stated above in its opinion.

Lastly, Father argues that the trial court erred and abused its discretion in demonstrating bias against him throughout the proceedings. Father's Brief at 43. In so arguing, Father essentially claims that the court considered evidence not appropriately before it. Father refers back to the hearing in July 2017 on his Petition for Special Relief and notes that the court, despite acknowledging that it was only hearing one side of the story due to Maternal Aunt's failure to appear, awarded Maternal Aunt primary physical custody. *Id.* at 43-45. Father states,

> The [c]ourt's open acknowledgment that it had only heard one side of the story; that the record established [Maternal] Aunt's notice of the proceeding; that [Maternal] Aunt was not providing information to the Father or responding to [c]ourt appearances; and that compliance by [Maternal] Aunt was not expected, should have led to the conclusion that Father, being the only party to have been present and provided competent evidence as to having adequate resources available to care for the child, met his burden of proof at the time, and should have been granted the relief requested of interim temporary primary [physical] custody. What instead was enacted by the trial court was a puzzlement in due process.

*Id.* at 44.

Father further asserts that the court allowed hearsay evidence from Maternal Aunt as to the prior living arrangements of Mother and Child. *Id.* at 45-48. Father states, "[s]hortly after the commencement of the Aunt's [case-in-chief], counsel for the Father made a hearsay objection, which was

angrily overruled by the [c]ourt, and included a statement that it was willing to consider hearsay testimony provided by the Aunt."[18]  *Id.* at 45.  Father contends that the court's "raised voice, extensive refutation, and rationale of preparing to accept hearsay testimony had a chilling effect on further objections." *Id.* at 46.  He continues,

> Nevertheless, with this explanation after the first objection raised against [Maternal] Aunt, the trial court expressed his openness to receive hearsay in contravention to the rules of evidence.  The [c]ourt then arguably relied on the hearsay testimony presented by the [a]unt as to why she did not appear for hearings, when [Maternal] Aunt attributed statements by the Court Administrator as justifications for why she did not appear for the hearing on the Petition for Special Relief.

*Id.* at 47-48.

In addition, Father purports that the court received information regarding the custody matter filed in New York by Maternal Aunt as the New York court alluded to receiving extensive information from Pennsylvania. *Id.* at 48-50.

> [T]he [c]ourt's statement proclaiming no knowledge of the New York filing does not square with the statement received from the New York State [c]ourt, as this counsel stated to this trial court, as a verbatim quote that they (the New York State court) received "extensive documentation" from Pennsylvania to establish jurisdiction over the case.  The judge who entered the final order which was appealed from

---

[18] The court responded to the objection in question as follows:  "Okay.  There was a lot hearsay presented before.  You presented testimony of statement[s] regarding [Mother].  Her statements that [Child] made, so I think the door is open.  I can assess the probative value of [the] testimony."  N.T., 11/26/18, at 218-219.

was the only jurist known to have entered any order on the record.

The reality is there were serious allegations against the Father in the New York State [c]omplaint, all of which would have been denied, but which could have influenced the trial court if read. Father's concern is that, similar to the willingness to presume facts not offered or proven at the Special Relief Hearing in support of temporary physical custody for [Maternal] Aunt; similar to the willingness to consider hearsay evidence during the custody trial; this [c]ourt may have considered statements not properly presented into evidence. Why the trial court would have stated it had no knowledge of that case, instead of acknowledging its participation in a jurisdictional determination, is unknown.

*Id.* at 49-50.

Father, however, waived this issue by failing to raise it in the court below as the matter proceeded. *See* Pa.R.A.P. 302(a) (providing for waiver of issues not first raised in lower court); ***Fillmore v. Hill***, 665 A.2d 514, 515-16 (Pa.Super. 1995) (stating, "[I]n order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error, such as an erroneous jury instruction, will result in waiver of that issue. On appeal, the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected") (citations omitted).

Critically, Father failed to raise any claim of bias in the trial court. Father did not raise any further objections as to hearsay, and did not raise objections regarding the New York proceeding. Moreover, as to the New York proceeding, Father's assertions are patently speculative, as there is no indication as to

who from Warren County, Pennsylvania provided the New York court information. In fact, the trial court indicates that it did not have contact with any judge from New York. N.T., 11/26/18, at 52.

Accordingly, for the foregoing reasons we affirm the trial court's order.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/15/2019